**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE SOUDERTON AREA | : | |
| SCHOOL DISTRICT, | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| v. | : | NO. 08-2477 |
| | : | |
| J.H., by and through his parents, J.H. | : | |
| and S.H., and J.H. and S.H. | : | |
| in their own right, | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                    **February 11, 2009**

The question presented in this case is whether a school district should pay the

private school tuition of a learning disabled student.   Pursuant to the Individuals with

Disabilities Education Act,[1] J.H., by and through his parents, J.H. and S.H., initiated due

process hearings against the Souderton Area School District (Souderton) for failing to

provide an appropriate individualized education program (IEP),[2] thereby denying him a

free appropriate public education (FAPE).   Both parties have moved for a judgment on

the administrative record (Defs.' Mem. (Document #10); Pl.'s Mem. (Document #12)).

---

[1]  The Individuals with Disabilities Education Act (IDEA) ensures that children with disabilities have access to a free appropriate public education (FAPE). 20 U.S.C. § 1400(c)(3) (2006).  If parents disagree with the school district's evaluation, placement, or provision of a free and appropriate education to their child, they may request a due process hearing conducted by a hearing officer.  22 Pa. Code § 14.162(b).  The parent or the school district can then appeal the hearing officer's decision to the special education appeals panel.  Id. § 14.162(o).  After the appeals panel renders a final administrative decision, either party has the right to bring a civil action in federal or state court.  20 U.S.C. § 1415(i)(2).  This court therefore has jurisdiction to review the decision of the appeals panel.

[2]  The special education services to be provided to a disabled child must be tailored to his unique needs, and are set forth in an individualized education program (IEP).  Id. § 1414(d)(2)(A).  The IEP "consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive."  Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d171, 173 (3d Cir. 1988).

At their request, the parties presented oral arguments on December 1, 2008.  After careful

consideration, I will grant Souderton's motion and deny J.H.'s motion.


## I. Background

J.H. is a minor who suffers from certain learning disabilities.  These were first

identified when he was in the first grade.  He was diagnosed with "a phonologically based

learning disability that affect[s] decoding and encoding and a weakness in visual and

auditory memory that affect[s] acquisition of sight words and math skills."  (Defs.' Mem.

at 1).  He has also been found to have "low average to lower end of average range

cognitive [abilities]."  Jonathan H. v. Souderton Area Sch. Dist., 2008 WL 746823, at *6

(E.D. Pa. Mar. 20, 2008).  He has received special education services in reading, writing,

and math.  (Id. at 1–2.)  Of these, writing has been his area of greatest need.  (Id. at 2.)

During the relevant time period, he was thirteen years old.

J.H. was enrolled in the Souderton Area School District (Souderton) through the

2005–2006 school year (fifth grade).  His parents then unilaterally decided to remove him

and placed him at The Crossroads School (Crossroads) for the 2006–2007 (sixth grade)

school year.  Crossroads is a private school in Paoli, Pennsylvania, geared to instructing

children with learning disabilities.  (Defs.' Mem. at 2.)  J.H. continues to attend that

school at his parents' expense.  Pursuant to 20 U.S.C. § 1414(d)(2)(A), Souderton has

continued to draft IEPs for J.H. for each school year.

### A) Prior proceedings between the parties

The present case is the second set of proceedings between these parties.  The first set of proceedings arose in March, 2006, when J.H.'s parents rejected the Notice of Recommended Educational Placement (NOREP)[3] and the IEP.  Jonathan H., 2008 WL 746823, at *1.  The parents rejected the IEP because they believed the specially designed instructions (SDI) were insufficient and that the goals did not reflect "meaningful progress placement."  (Dr. Linda Valentini's report at 8, Findings of Fact ¶ 29 (Souderton Ex. 1).)  They also believed the IEP may have failed to address J.H.'s speech and language needs.  (Id.)

A few months thereafter, his parents decided to apply for J.H.'s admission to Crossroads.  Jonathan H., 2008 WL 746823, at *1.  At or around this time, J.H. and his parents commenced due process hearings against Souderton pursuant to 20 U.S.C. § 1415(f).  They sought compensatory education for the 2004–2005 and 2005–2006 school years (the years J.H. was still enrolled in Souderton's schools), and tuition reimbursement for J.H.'s enrollment at Crossroads for the then-upcoming 2006–2007 school year.[4]

After several sessions with the parties and counsel, the hearing officer, Dr. Linda Valentini, issued her decision on April 20, 2007.  Consulting the results of two

---

[3] The NOREP sets forth the specific school or other educational placement recommended by the local education agency.

[4] Under the IDEA, the parents of a learning-disabled child who had received "special education or related services under the authority of a public agency" and is unilaterally enrolled in a private school by the parents may be reimbursed for the costs of that enrollment if a court or hearing officer finds that the agency failed to provide a FAPE in a timely manner prior to that enrollment.  20 U.S.C. § 1412(a)(10)(C)(ii).

individually administered, nationally normed, standardized tests—the Wechsler Individual Achievement Test (WIAT II), and the Woodcock Johnson Third Edition (WJ III)—Dr. Valentini found that J.H. had made "meaningful educational progress" in reading and in math while attending Souderton schools.  (Valentini Report at 16.)  She concluded that Souderton did provide a FAPE in those areas.  (Id. at 18.)

In the area of written expression, Souderton had failed to routinely assess J.H.'s performance.  Based on the available data, Dr. Valentini could not find that he had made meaningful educational progress.  (Id. at 16–17.)  She concluded that Souderton had failed to provide a FAPE in the area of written expression while J.H. was still a Souderton student.  (Id. at 18.)  She awarded J.H. some compensatory education in this area  (Id.)

As for the 2006–2007 IEP, she found that it did provide a FAPE.  (Id. at 17.)  It contained, among others, present levels of academic achievement, measurable annual goals, descriptions of how J.H. was to reach those goals, descriptions of how Souderton would track J.H.'s progress, and a statement of the special education services and program modifications he would receive.  (Id.)  She noted that "[t]he IEP would be enhanced by the addition of 'annual administration of a standardized achievement assessment instrument such as the WJ III' under the progress monitoring section of each goal . . . ."  (Id.)  She suggested that Souderton "use the WJ III or another similar instrument with a nationally normed well-researched sample to assess writing."  (Id.)

Having found that J.H. and his parents had failed to demonstrate that the

2006–2007 IEP would not provide a FAPE, she declined to address their tuition reimbursement request.  This decision was upheld on appeal by the Pennsylvania Special Education Appeals Review Panel (Appeals Panel) and the Honorable Judge Katz.[5]  (See 2007 Appeals Panel Report (Souderton Ex. 2); Jonathan H., 2008 WL 746823.)

**B) Evaluations performed prior to the drafting of the 2007–2008 IEP**

In June and July of 2007, J.H. underwent an occupational therapy (OT) evaluation performed by Ms. Amy Carroll, a licensed occupational therapist.  (See OT Report (J.H. Ex. 5).)  His parents paid for the evaluation after some of the Crossroads teachers expressed concern about J.H.'s handwriting skills.  (Id. at 1.)  Ms. Carroll tested his motor, hand, visual, visual perceptual, visual-motor, and handwriting skills.  (Id. at 2–4.)  The results indicated "significantly decreased visual-motor skills which likely impacts [J.H.'s] handwriting performance."  (Myers Report, Findings of Fact ¶ 3 (Joint Ex. 3).)  Ms. Carroll noted that J.H. wrote slowly and that his handwriting was at times difficult to decipher.  (OT Report at 3–4.)  She recommended that J.H. be provided OT once a week "to increase his legibility with written output."  (Id. at 4.)  She also suggested that he be instructed on using cursive and be permitted the use of a computer for longer writing assignments.  (Id.)

In August, 2007, Souderton reassessed J.H.'s academic performance and skills using the WJ III.  (Myers Report, Findings of Fact ¶ 4.)  The assessment was performed

---

[5] An appeal is pending as to Judge Katz's dismissal of Souderton's counterclaims.

by Dr. Deborah Nelson.  On the Broad Reading section,[6] J.H. performed at a 4.3 grade

equivalent (fourth grade, third month); Broad Written Language,[7] 4.3 grade equivalent;

Broad Math,[8] 5.1 grade equivalent.  (IEP at 31 (Souderton Ex. 6).)  J.H.'s math

calculations skills were at a 4.6 grade equivalent.  (Id.)  His academic skills[9] were rated at

a 5.3 grade equivalent; academic fluency,[10] 3.8 grade equivalent; academic applications,[11]

4.5 grade equivalent.  (Id.)

He was also asked to provide a writing sample by responding to an essay prompt.

(Id. at 36.)  The sample was analyzed under the Pennsylvania System of School

Assessment (PSSA) writing rubric.  On the PSSA's four-point scale, J.H.'s writing

expression was determined to be a 1, which represents "below basic" performance.  (Id. at

48–49.)  This assessment was reached on the basis of this one sample alone.

**C) The 2007–2008 IEP**

In light of the prior proceedings and the 2007 WJ III results, Souderton began the

---

[6] The Broad Reading test is "[a] comprehensive measure of reading achievement including reading decoding, reading speed, and the ability to comprehend connected discourse while reading.  (IEP at 31.)  The subtests are Letter-Word Identification, Reading Fluency, and Passage Comprehension.  (Id.)

[7] The Broad Written Language test is "a comprehensive measure [of] written language achievement including spelling of single-word responses, fluency of production, and quality of expression."  (Id.)  The subtests are Spelling, Writing Fluency, and Writing Samples.  (Id.)

[8] The Broad Math test is "[a] comprehensive measure of math achievement including problem solving, number facility, automaticity, and reasoning."  (Id.)  The subtests are Calculation, Math Fluency, and Applied Problems.  (Id.)

[9] The academic skills portion provides "[a]n aggregate measure of reading, decoding, math calculation, and spelling of single-word responses providing an overall score of basic achievement."  (Id.)

[10] The academic fluency score is "[a] combination of Reading Fluency, Math Fluency, and Writing Fluency and provides an overall index of academic fluency."  (Id.)

[11] The academic applications portion tests "the application of academic skills to academic problems."  (Id.)  It is determined from the test taker's Passage Comprehension, Applied Problems, and Writing Samples scores.

process of formulating the 2007–2008 IEP.  This IEP also incorporated the results of

J.H.'s performance at Crossroads.  A draft was presented and discussed with J.H.'s

parents on August 28, 2007.  (<u>See</u> IEP meeting notes at 1 (Souderton Ex. 4).)  At this

meeting, Souderton was first informed of Ms. Carroll's OT evaluation.  (Test. of Ms.

Rebecca Fogle 95:9–13, Nov. 8, 2007.)  Speech/language services were not included in

this draft of the IEP; when asked to identify any additional area of need, J.H.'s parents did

not specify any.  (IEP meeting notes at 1, 3 (identifying J.H.'s needs as primarily in

reading fluency and comprehension, written expression, math fluency and calculation,

and self-advocacy).)

On September 10, 2007, J.H.'s parents rejected the proffered NOREP and IEP for

failure to address certain needs, namely J.H.'s OT, writing, and language needs.[12]  (IEP at

2 ("IEP does not adequately address writing and language development.").)  They

commenced due process hearings to challenge the IEP for the absence of measurable

goals in writing and failure to address J.H.'s speech/language and OT needs.[13]  Wishing

to keep J.H. enrolled at Crossroads, his parents again sought tuition reimbursement.

The hearing officer at the second proceeding, Daniel J. Myers, Esq., heard

testimony from Ms. Jennifer Cordivari, Crossroads' psychologist and education director;

---

[12] In response, Souderton asked for permission to re-evaluate J.H.'s language and speech skills. (Permission to Reevaluate (Souderton Ex. 9).)  The parents do not appear to have consented.

[13] The private OT report was not provided to the Souderton until mid-October; Souderton revised the IEP to include an offer to re-evaluate J.H. within 30 days of his re-enrollment in Souderton's schools. This issue is discussed in greater detail below at Part III.D.

Ms. Rebecca Fogle, Souderton's supervisor of secondary special education; Ms. S.H.,

J.H.'s mother; and Ms. Dona Italiano, Souderton's language arts coordinator and literacy

coach for grades 6 through 12.  Mr. Myers found that the IEP provided a FAPE and

denied the parents' request for relief.  His report discussed the Valentini Report, which

found the prior IEP to be sufficient in almost all areas, and noted that "nothing has

changed except that [Souderton] has strengthened its proposed IEP."  (Myers Report at

7.)  Mr. Myers characterized the new IEP as including "updated present levels of

academic performance," "updated and individualized writing goals," and "monthly

consultation[s] between [J.H.'s] special education teacher and a speech therapist."  (Id. at

7–8.)

Mr. Myers dismissed J.H.'s language development and writing instruction

arguments.  He noted that Dr. Valentini had already considered and rejected the language

argument.  As "no new evidence of changed speech and language needs" had been

presented, he deemed that the issue had already been ruled on, and that this IEP could not

be considered inadequate for not including such services.  (Id. at 8.)

As to the writing instruction complaint, Mr. Myers summarizes J.H.'s argument as

based on the findings of a private OT evaluation report, Souderton's insistence on using

the PSSA writing rubric as an assessment tool, and Souderton's failure to have an

appropriate program in place at the beginning of the school year.  (Id. at 8–9.)  He found

the OT report to be "equivocal," indicating there might be some needs but not stating that

OT was a requirement; moreover, Souderton was entitled to perform its own evaluation before having to include OT in the IEP.  (Id. at 9.)  Although Souderton continued to include the state PSSA writing rubric, which has been held to be an inappropriate assessment tool, it had sufficiently compensated for the rubric's shortfalls by including the WJ III as another mode of assessing improvement.  (Id. at 9–10.)

Finally, the proposed IEP was determined to be proper given that the parents had not provided the OT evaluation report to Souderton until mid-October.  The revised IEP provided for an OT evaluation to be performed within a certain time after J.H.'s return to Souderton's schools.  (See Revised IEP (Souderton Ex. 15).)  Mr. Myers found this to be a timely and appropriate response.  (Myers Report at 9.)  Because he found the IEP to be appropriate, Mr. Myers declined to address the tuition reimbursement request.

The Appeals Panel found that the IEP failed to provide a FAPE and reversed Mr. Myers' ruling.  The decision identified a number of deficiencies such as a lack of clarity in describing J.H.'s present levels of educational performance, and the failure to address his OT needs.[14]  Given J.H.'s severe difficulty with processing, the IEP "[did] not

---

[14] The decision noted the following deficiencies:
1. The present levels of education performance were impermissibly vague. (e.g., The annual goal in spelling is, "{S} will improve his spelling skill."  It is not possible to determine from the reported present levels the words S can spell, the decoding skills that S possesses, or S's current accuracy and fluency in spelling).
2. The annual goals and short term instructional objectives were not objective or measurable.  The goals did not enable one to tell what S was expected to accomplish.  (e.g., Goal – "to assist S in accessing his education").  The ubiquitous word "sufficient" does not provide a baseline measure against which progress can be monitored systematically (e.g., Objective – "will

[adequately] address [his] needs" and was "not calculated to provide meaningful educational benefit." (2008 Appeals Panel Report at 4 (Joint Ex. 4).)

The Appeals Panel granted J.H.'s tuition reimbursement request. It determined that Crossroads' program addressed J.H.'s needs, and noted his progression in many areas. In weighing the equities, the Appeals Panel stated that the parents "have cooperated" with Souderton and "have attended IEP team meetings consistently expressing as best they could their concerns . . . ." (Id. at 5.) The Panel also noted that Souderton had not performed a psychoeducational assessment and had failed to appropriately assess J.H.'s performance in written expression. Accordingly, the Panel found in favor of J.H. and his parents and awarded tuition reimbursement. Souderton

---

write written response that involves sufficiently developed content. . . ;"
"will write written response that uses sufficient control of grammar.)

3. Several goals (e.g., reading fluency, reading comprehension, math fluency) fail to include benchmarks and short-term objectives which contain measurable outcomes. There is no indication of how these goals correspond to the curriculum.

4. The SDI included in the IEP is not adequate, as it consists mainly of accommodation rather than the intensive, explicit, systematic and sequential instruction S requires to address significant weaknesses in decoding, encoding, processing, reading comprehension and listening comprehension (e.g., required daily check in with IEP Special Education Teacher; Special Education and Regular Education teachers will consult regularly; staff working with S will be allowed to read and discuss S's IEP with the Special Education Teacher)

5. The proposed IEP fails to address S's need for Occupational Therapy (OT) services. The Panel is persuaded that the privately secured OT evaluation obtained by the Parents provided essential information about S's educational profile and needs not previously contained within the District's evaluations.

6. The Appeals Panel has held previously that the state PSSA writing rubric, upon which the written expression goals are based, does not meet the requirements of objective measurement by IDEA and special education regulations.

(2008 Appeals Panel Report at 3–4.)

appeals this ruling.


## II. Applicable law

### A) The IDEA

State and local educational agencies receiving federal education funding must provide a FAPE to all disabled children in their jurisdiction.  See 20 U.S.C. § 1412(a)(1)(A) (requiring states to provide a FAPE).  This includes the provision of any necessary "related services" such as physical or speech therapy.  See Lauren V. v. Colonial Sch. Dist., 2007 WL 3085854, at *1 (E.D. Pa. Oct. 22, 2007).  The education agencies are to set out these education plans in an IEP.  Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) ("States provide a FAPE through [the IEP].").

To provide a FAPE, the IEP "must be sufficient to confer some educational benefit upon the handicapped child."  L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006) (internal quotation marks omitted).  The state's obligation, however, is not unlimited.  It is "not required to maximize the potential of handicapped children"; it need not "provide the optimal level of services, or even a level that would confer additional benefits.  T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000); Carlisle Area Sch. v. Scott P., 62 F.3d 520, 534 (3d Cir. 1995).

### B) Standard of review

The IDEA authorizes judicial review of administrative decisions.  20 U.S.C. § 1415(i)(2).  When reviewing these decisions, the district court should receive the records of the administrative proceedings; hear additional evidence at the request of a party; and grant appropriate relief based on the preponderance of the evidence.  Id. § 1415(i)(2)(c).

The appeals panel must conduct an impartial review of the hearing officer's decision and make an independent decision.  See id. § 1415(g)(2).  It must "defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."  Carlisle Area Sch., 62 F.3d at 529.

The district court's standard of review has been described as a "modified de novo" review.  Ramsey Bd. of Educ., 435 F.3d at 389.  The court must give "'due weight' to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision."  Carlisle Area Sch., 62 F.3d at 530.

At the administrative and district court levels, the burden of proof lies with the party challenging the IEP.  Schaffer v. Weast, 546 U.S. 49, 62 (2005).  Since J.H. was the party who challenged below, he continues to bear that burden here.

### III. Discussion

Souderton and J.H. have moved for judgment on the administrative record.  After review of the hearing officer's report, the appeals panel's decision,[15] the parties' arguments, and the record below, I find that the IEP did provide a FAPE.

#### A) Identified errors were procedural

I will dismiss Souderton's initial argument that the IEP's errors, if any, were only procedural.  Souderton argues that the only fault found in the IEP was that its annual goals were vague and not measurable, which would not be a basis for finding J.H. was denied a FAPE.  (Pl.'s Mem. at 9.)  Procedural errors do not violate the right to a FAPE unless they result in "the loss of educational opportunity, seriously infringe upon the parents' opportunity to participate in the IEP formulation process, or cause a deprivation of educational benefits."  See Escambia County Bd. of Educ. v. Benton, 406 F. Supp. 2d 1248, 1273 (S.D. Ala. 2005) (quotation marks and internal citations omitted). "'Vagueness and measurability problems' with goals are mere technical non-compliance." (Pl.'s Mem. at 9 (quoting Adam J. v. Keller Ind. Sch Dist., 328 F.3d 804, 811–12 (5th Cir. 2003)).)

Souderton fails to address the litany of other alleged faults the Appeals Panel identified.  (See 2008 Appeals Panel Report at 3–4.)  For example, statements on present

---

[15] As a preliminary matter, I note that the Appeals Panel report is sparse.  It provides little explanation as to why it found certain items objectionable.  It failed to cite to items in the record in a meaningful manner.  In short, its conclusions are clear; its reasoning, less so.  The Panel's failure to set forth the underlying reasoning forced this court to make educated guesses of the analysis.

levels of educational performance were found to be "impermissibly vague," and the SDIs were "not adequate."  (Id.)  J.H. also indicates that the IEP "failed to address [his] need for occupational therapy and speech and language services and that the IEP was not premised upon an adequate evaluation."  (Defs.' Reply at 6 (Document #17).)  If true, these shortfalls would certainly prevent J.H. from receiving an appropriate education. This is one of the very issues the IDEA was intended to remedy.  20 U.S.C. § 1400(d)(1)(A) (stating that one of the purposes is to "ensure all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . .").  I will dismiss Souderton's argument on this point and proceed to analyze the IEP in light of the parties' arguments.

**B) IEP requirements**

**1) Statement of present levels not impermissibly vague**

Contrary to the Panel's decision, the IEP's statement of present levels is not impermissibly vague.  The IEP contains J.H.'s progress reports from his time at Crossroads (IEP at 13–30), and these have been well-summarized (Id. at 9–12).  (See Test. of Ms. Jennifer Cordivari 36:10–42:11, 45:1–46:25, Nov. 8, 2007 (discussing J.H.'s progress reports, as included in the IEP).)  The results of the 2007 WJ III exam and the writing assessment were also included.  (Id. at 31–37).  No consideration appears to have been given to this data, which is both recent and quantitative.  Indeed, the Panel's

consideration of Souderton's and Crossroads' data on this point is uneven without

explanation.  I find that when considered as a whole these components provide a

reasonably clear statement of J.H.'s present levels.[16]

J.H. believes that the IEP does not accurately reflect his present level of

performance in written expression because the writing assessment was inadequate.

(Defs.' Mem. at 11–12.)  Ms. Dona Italiano, the faculty member who assessed the

sample, had only minimal contact with J.H.  (Id. at 12; Test. of Ms. Dona Italiano

247:5–20, Jan. 18, 2008.)  She did not explain the exercise and did not review any of his

other school records.  (Defs.' Mem. at 12.)  There were also concerns regarding the use of

plain paper.  (Test. of Ms. S.H. 170:19–23, Nov. 8, 2007 ("It is unusual for a child that is

in school to write on plain paper.  Everything is lined.  And it is from my understanding

lined paper is better for kids that have learning and writing issues.").)

I disagree.  J.H. focuses only on the writing assessment graded under the PSSA

writing rubric.  In addition to this measure, Souderton also used the WJ III on which J.H.

performed at a 4.3 grade equivalent on the Broad Written Language portion.  (Id. at 31.)

On the spelling achievement test, he performed at a 5.5 grade equivalent; writing fluency,

3.6; writing samples, 3.2.  (Id.)  Unlike the PSSA rubric system, the WJ III's procedure

can be considered more "objective" because it has been designed to provide statistically

---

[16]  The Panel does point out that J.H.'s spelling goals in the IEP provide almost no information
on what his current spelling skills are, but it did not seem to consider his WJ III results or his Crossroads
report.  (See IEP at 31–34.)

consistent numbers across a broad range of subjects and students.  Consequently, while a single administration of the WJ III may be sufficient to make an assessment of a student's present capability, a series of writing samples would have be to analyzed under the PSSA rubric to make an accurate evaluation.  Although J.H. may be correct in his criticism of one of the writing sample assessments, his argument does not carry to the WJ III results and he has not shown why that test is insufficient to assess his performance here.[17]

### 2) Annual measurable goals

The IEP's annual goals and short term instructional objectives were criticized as "not objective or measurable."  (2008 Appeals Panel Report at 3.)  The Panel identified three deficiencies: 1) the IEP contained no short-term objectives; 2) the use of the word "sufficient" in the IEP's goals did not provide "a baseline measure against which progress can be monitored systematically"; and 3) some of the goals "did not enable one to tell what J.H. was expected to accomplish."  (Id. at 3–4.)  I find that these criticisms are insufficiently explained, are unsupported by the record, and did not deny J.H. a FAPE.

### i) Alleged failure to include short-term objectives

---

[17] Assuming *arguendo* that the statement of J.H.'s writing baseline is inaccurate, this failure is partially mitigated by the fact that J.H. had been attending Crossroads.  See, e.g., Jeremy G. v. Abington Sch. Dist., 2008 WL 4633380, at *5 (E.D. Pa. Oct. 15, 2008) (concluding that the school district's failure to provide performance baselines for a student's handwriting and written expression performance was mitigated by the fact that the student had been attending a private school prior to the IEP's drafting); id. (finding that the student's baselines could be created when he returned to the school district).  Similarly, Souderton has repeatedly acknowledged that the PSSA writing assessment may not be an accurate reflection of his performance; the direct, integrated, and personal instruction they intend to provide under the IEP would give J.H.'s teachers the opportunity to continually reassess his performance and alter their plans, as necessary.

First, the IEP did include short-term objectives.  (IEP at 42, 46, 48, 53 (providing short-term objectives in the areas of word identification, spelling, writing, and self-advocacy).)  If these provisions did not meet the Panel's expectations of what a "short-term obejctive" should be, the Panel should have explained why.  J.H. has not offered his own argument on this point.

More importantly though, short-term objectives are no longer a required IEP component.  The Individuals with Disabilities Education Improvement Act, Pub. L. 108-446, which reauthorized the IDEA and was in force at the time the IEP was drafted, made short-term objectives a requirement only for those students "who take alternative assessments aligned to alternate achievement standards . . . ."  20 U.S.C. § 1414(d)(1)(A)(i)(I)(cc); see also Assistance to States for the Education with Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46,540, 46,663 (Aug. 14, 2006) (noting the statutory change providing for the removal of short-term objectives as a required IEP component).  If he returned to Souderton's schools, J.H. would not take these alternative assessments.  (IEP at 40.)  Souderton's failure to include an optional provision is not fatal to its IEP.

### ii) Use of the word "sufficient"

Use of the word "sufficient" does not defeat the IEP.  The term is only used to describe two short-term objectives: 1) "[J.H.] will write a written response that evidences *sufficiently* developed content with adequate elaboration or explanation," and 2) "[J.H.]

will write a written response that evidences an apparent point made about a single topic

with *sufficient* awareness of task." (Id. at 48 (emphasis added).)  As discussed above,

short-term objectives are no longer required to be included as IEP components.

Criticizing the IEP for its wording of these optional provisions, which were included to

improve J.H.'s performance, defies common sense.

### iii) Allegedly vague wording of objectives and goals

It is not entirely clear which objectives and goals are so vaguely worded as to

prevent one from discerning what J.H. was expected to do.  The Panel Report provides

almost no analysis or reasoning.[18]  After reviewing the IEP, I find that the large majority

of the listed goals *do* provide clear annual objectives.  (See, e.g., id. at 42 ("J.H. will

increase his word identification skills to a 6.2 grade equivalent."); id. at 43 ("J.H. will

increase his reading fluency to a 5.1 grade equivalent."); id. at 44 ("After reading a

passage on the 5th grade reading level, J.H. will correctly answer comprehension

questions with 90% accuracy."); id. at 52 ("J.H. will solve multi-step word problems at

the 7th grade instructional levels including basic math operations, fractions, decimals,

---

[18] The sole example the Panel Report cites is, "[J.H.] will utilize the self-advocacy strategies . . . to assist him in accessing his education."  (Id. at 53.)  The Appeals Panel and J.H. have not adequately explained why this single goal makes the IEP "vaguely worded."  The goal's non-academic nature make its desired result unquantifiable, but the outcome would be clear.  Unlike the previously quoted goals covering reading, writing, and mathematics, this goal is one for social and personal improvement.  J.H. does not refute Souderton's assertion that "[w]hile there is not baseline of performance, that might be a consequence of not previously having such a goal (and which is also not part of the regular curriculum for which generalized class performance data would be available.)" (Pl.'s Mem. at 15.)
    Getting J.H. to access his education should yield clear results: either he attempts to ask for assistance or communicate his needs, or he remains silent.  This performance can be easily determined.

percentages, and ratios with 90% accuracy on 3 consecutive curriculum based measures.").)  J.H.'s baseline performance is also provided with each goal.  It is evident that Souderton set out clear, identifiable goals in light of J.H.'s current capabilities. Inexplicably, the Panel did not address why these goals were insufficient.

### 3) Specially Designed Instructions

The IEP contains numerous SDI to address J.H.'s weaknesses.[19]  Schools are required to "[adapt], as appropriate to the needs of an eligible child . . . the content,

---

[19] The modifications and SDIs to be provided to J.H. are:
- Required daily check in with IEP/Special Education teacher at the beginning and end of every school day.
- Assistance with coursework, study and organization skills, and concepts during 8th period learning support room periods
- Direct, explicit, integrated, multi-sensory instruction, using the research-based Orton-Gillingham approach, to address reading fluency and decoding and encoding skills, with particular attention to multisyllabic words, including content area multisyllabic words.)
- Direct, explicit, systematic, integrated, multi-sensory instruction in the area of reading comprehension skills
- Direct, explicit, systematic, integrated, multi-sensory instruction in the area of written expression
- Direct, explicit, systematic, integrated, multi-sensory and spiraled instruction in the area of math fluency, computation, and problem solving using continued review and repetition to maintain skills
- Books on tape/CD/MP3/Kurzweil
- Use of word processor for all written work
- Franklin Speller/Spell Check
- Scaffolded notes (cloze method)
- Calculator
- Test taken in Learning Support Room and read to student
- Extended time for testing and assignment completion
- Preferential seating in front of instructional area to insure focus and attention to task (teacher will observe Jonathan to determine which side of presentation area is most effective for him).
- Multi-sensory instruction
- Conferencing with IEP teacher to instruct and reinforce self-advocacy skills

(IEP at 54.)

methodology, or delivery of instruction (i) to address the unique needs of the child that

result from the child's disability; and (ii) to ensure access of the child to the general

curriculum, so that the child can meet the educational standards within the jurisdiction of

the public agency that apply to all children."   34 C.F.R. § 300.39(b)(3).

      After reviewing the SDI, I find that they do provide for "intensive, explicit,

systematic and sequential instruction."   Souderton intends to use the Orton-Gillingham

approach and the CLOZE method to improve J.H.'s reading skills.  The math instruction

will emphasize repetition and review to help J.H. maintain and improve his computation

skills.  By using "scaffolding"[20] and "framing"[21] as part of its overall writing instruction

plan, Souderton will be able to better address J.H.'s specific writing deficiencies.  Ms.

Italiano also described the kind of integrated instruction J.H. would receive as part of the

---

[20] As Ms. Italiano explained,

> Scaffolding is teacher support or support materials to help the learner do things with support that they will eventually be able to do on their own.  So let us say that a student is not able to write a complete sentence.  Scaffolding technique might be to create a frame in which there is a sentence which is missing its subject and the teacher's prompt is: make this a complete sentence by putting in a noun, and then there would be additional practice, ultimately write a complete sentence, and then the instructor would look that the student now has recognized that what makes it complete is the noun, the subject of the sentence.

(Test. of Ms. Italiano 223:3-18.)

[21] Framing is a technique similar to scaffolding.  The teacher would provide the structure for a writing assignment  (Id. 223:23–24.)  Ms. Italiano offered the following example:

> [Y]ou would say we want five paragraphs, let's say and one paragraph is your introductory paragraph.  We want three support paragraphs and a conclusion.  In your introductory paragraph, your first sentence is a statement of your topic with the three points that you wish to illustrate.  And then the frames for the subsequent paragraphs might say: Take the first idea from your intro and place it here; take the second idea from your intro, place that for the second paragraph.

(Id. 223:24–224:10.)

regular curriculum at his middle school.[22]

I am also persuaded by the fact that these same SDI were found to be appropriate in the previous round of proceedings.  (See Pl.'s Mem. at 21.)  The Panel's failure to explain why these same provisions should now be considered inappropriate weighs against overruling those prior decisions.  After review, I find that they are adequate and designed to provide the instruction J.H. needs for his success.

### 4) Writing standards and assessment rubric

J.H. argues that the IEP does not provide an objective measurement of his writing achievement and that the WJ III would fail to track his personal progress.  (Defs.' Mem. at 15–16.)  I will dismiss both claims.

### i) Need for objective measure of achivement

First, the WJ III exam included in J.H.'s writing expression goals is an objective measure of achievement.[23]  Though the Panel noted that the "PSSA writing rubric, upon which [J.H.'s] written expression goals are based, does not meet the requirements of objective measurement by IDEA and special education regulations," (2008 Appeals Panel Report at 4), it fails to mention that the IEP actually contains *two* writing goals: the PSSA

---

[22] Ms. Italiano described curriculum integration based on content area for sixth, seventh, and eighth graders.  (See id. 227:4–228:8.)  Students reading about a certain topic could be expected to "[create and present] multi-modal, multi-sensory displays using Powerpoint and any variety of technology [Souderton has], including traditional ones like posters and clipping pictures and making collages."  (Id. 227:13–19.)  To facilitate this process, teachers are given time to plan as a team for their students' needs.  (Id. 228:2–4.)

[23] Souderton's inclusion of the WJ III as a yardstick directly addresses a criticism levied at the prior IEP.  She had recommended the use of "the WJ III or another similar instrument with a nationally normed well-researched sample to assess writing."  (Valentini Report at 17.)

writing rubric, and the WJ III-based writing goals.  (See IEP at 47.)  The Panel made no

analysis of the effectiveness of this proposed dual system.

The WJ III assessment provided scores on J.H.'s performance in various areas

including writing fluency.  (IEP at 33–34.)  Based on this exam, the IEP set forth the goal

of "improving [J.H.'s] written expression to a 4.2 grade equivalent" through the

incorporation of "greater detail in his writing samples and using proper grammar,

mechanics, and sentence and paragraph formation . . . ."[24]  (Id. at 47.)  His progress is to

be monitored by administering the WJ III annually, producing various writing samples,

and assigning daily written work.  (Id.)  It is clear that J.H.'s writing progress can be

measured objectively through the WJ III.

### ii) Need to track personal achivement

J.H. argues though that the WJ III would not measure his specific areas of need.

As a nationally normed and standardized test, the WJ III would show how the test taker

performed against a national sample; it would not necessarily track what individual

progress the student may have made.  This argument, however, reflects only half of the

IEP.  There are two written expression goals.  The PSSA writing rubric provides a set of

criteria to assess a writing sample's focus, content, organization, style, and adherence to

conventions.  (See Test. of Ms. Italiano 212:4–15.)  As Ms. Italiano testified, determining

whether a writing sample met certain of the above criteria is not necessarily a subjective

_____

[24] This is in addition to the (objectionable) PSSA-based annual goal.  (IEP at 48.)

exercise "[b]ecause the features under each . . . are fairly well described."  (Id. 273:1–2.)

Also provided are exemplars, which "[allow] [a teacher] to look at what the range of

possibility might be within a given age range."  (Id. 274:7–9.)  When one bears in mind

that the IEP would have J.H. submit multiple writing samples, his teachers will have

numerous opportunities to assess J.H.'s work over the long run and track his *personal*

performance.  When implemented in conjunction with the WJ III (the overarching

objective standard), the PSSA rubric can provide the personal assessment J.H. desires.[25]

### iii) Need for research-based writing instruction

J.H. also claims that Souderton's proposed writing curriculum would violate the

IDEA's requirement of the use of a research-based program for instruction.  (See Defs.'

Mem. at 13–14; 20 U.S.C.A. § 1414(d)(1)(A)(i)(IV) (stating that an IEP shall include "a

statement of the special education and related services and supplementary aids and

services, based on *peer-reviewed research* to the extent practicable . . . ." (emphasis

added).)  Souderton's proposed writing approach, which J.H. identifies as being called

"scaffolding," allegedly fails to meet that definition.[26]  (Defs.' Mem. at 13.)  This issue is

raised here for the first time.

I find that J.H. has failed to demonstrate that the IEP's writing instruction plan

---

[25] J.H. has cited several Appeals Panel reports dismissing the PSSA writing rubric as subjective and not measurable.  (See Defs.' Mem. at 15.)  Those cases are factually distinguishable as none of those IEPs contained the dual system Souderton has proposed.  The PSSA writing rubric may be insufficient standing alone, but when considered in conjunction with an unquestionably objective measure of achievement, the rubric may prove to be more effective.  The Panel failed to address this point, and J.H. has not shown why these goals cannot be used together.

[26] See *supra* note 20.

fails to provide a FAPE because Souderton's proposed writing instruction, the "writing

process," has been identified as a "best practice" and is sufficient to satisfy the IDEA's

requirements.  Contrary to J.H.'s assertion, the writing instruction provided through the

IEP is not "scaffolding" alone.  (See id.)  Rather, Souderton had proposed to use the

"writing process."  (See Test. of Ms. Italiano 221:22–23.)  Ms. Italiano described it as

follows:

> [I]n her work called "The Composing Process of Twelfth Graders," . .
> . [Janet Emig] observed that a pre-writing phase occurs, drafting,
> revision, editing, and then completion or publication.  And those may
> occur recursively during the writing, so it would not necessarily be,
> okay, today is the day of pre-writing; tomorrow is the day of revising.
> A student may go back, loop back, go forward, loop back.

(Id. 222:6–16.)  It is a "best practice," (Id. 222:17–19), and is appropriate for learning-

disabled students as well (Id. 222:20–25).[27]  Scaffolding is but one technique to be used in

this process.  (See id. 222:20–223:18.)  Each teacher would determine how much

scaffolding to use with an eye on using the writing process approach.  (See id. at

249:3–14 (stating that the level of scaffolding would be determined by the student's

_____

[27] When cross-examining Ms. Italiano, Mr. Stanczak, J.H.'s attorney, asked numerous questions regarding her professional background.  He established that she is not a special education certified teacher (Test. of Ms. Italiano 242:22–24), she is not a speech and language therapist (id. 244:6–8), and that she had only minimal contact with J.H. when making her assessment (id. 246:6–247:11).  Ms. Italiano does no direct teaching: she works as "a literacy coach and co-teach[es] with or do[es] a model or demonstration lesson for the instructor."  (Id. 248:20–249:2.)  By her own admission, she is unfamiliar with the research regarding the assessment of writing for students with learning disabilities.  (Id. 251:5–21.)
    These admissions do not cast a sufficiently significant shadow on Souderton's use of the writing process.  These do not show the writing process to be an improper pedagogical method for teaching learning disabled children such as J.H.

teacher, but that "generally all teachers would use the writing process approach" of "some pre-writing, some drafting, some editing.").)

J.H. appears to prefer Crossroads' Orton-Gillingham approach, but he does not specifically address why the writing process would be an insufficient mode of instruction. J.H.'s desire for one does not sully the appropriateness of others. I find that Souderton's proposed use of the writing process is sufficient to provide J.H. a FAPE.

### iv) Failure to provide for sufficient progress

The WJ III writing goal is for J.H. to perform at a 4.2 grade equivalent by the end of the academic year. (IEP at 47.) J.H. believes this to be an insufficient amount of progress because the IDEA "now incorporates the expectation of grade-level performance." (Defs.' Mem. at 14.) The current IEP would leave him too far behind his peers, but he does not specify what amount of progress would be sufficient. This argument is being considered for the first time. J.H.'s expectation of being able to perform at or near his grade-level within a year is laudable, but it does not make this IEP inappropriate. I see no reason why a year's progress in a year's time is insufficient in this case, and J.H. has presented no authority to the contrary.[28]

---

[28] His assertion that the 2004 amendments to the IDEA now require states and school districts to close the performance gap between the disabled and non-disabled goes too far. (Defs.' Mem. at 14.) These amendments allegedly incorporated the No Child Left Behind Act's provision calling for states to "[close] the achievement gap between high and low-performing children . . . and between disadvantaged children and their more-advantaged peers." 20 U.S.C. § 6201 (2006). This is to be implemented, in part, through tracking "adequate yearly progress." Id. § 6311(B)-(C). "For a school to make adequate yearly progress, the student population as a whole, as well as each identified subgroup of students, must meet the same proficiency goal." James E. Ryan, The Perverse Incentives of the No Child Left Behind Act, 79 N.Y.U. L. Rev. 932, 940 (2004). Not all students must meet the goal, just a sufficient number of

**C) Speech and language needs**

Contrary to J.H.'s assertions, Souderton did not fail to provide the services necessary to address his alleged speech/language needs in the IEP. The record reveals that the evaluations submitted by the parties do not conclusively demonstrate that J.H. had a speech/language disability and the current draft of the IEP already addresses some of these concerns.

**1) The record does not support J.H.'s claim that Souderton disregarded his alleged speech/language disability**

The evidence on this claim is mixed. J.H. contends that a 2005 evaluation performed by Ms. Sara Schwed placed Souderton on notice of his need for these additional services. (Defs.' Mem. at 16.) In that report, Ms. Schwed noted that "[J.H.] gave very minimal responses, needing consistent encouragement to elaborate as needed." (Schwed Report at 3 (J.H. Ex. 1).) She concluded, "[J.H.] will benefit from direction and encouragement to respond orally in full, complete sentences. This will certainly facilitate understanding of complete thoughts, which will facilitate transfer into writing of complete sentences." (Id. at 8.)

This conclusion was seemingly confirmed by an audiology examination performed

---

the entire population and each statutorily defined subgroup. For example, if the proficiency goal were set at 75%, then 75% of the entire school's populations would have to display proficiency and 75% of the disabled student subgroup must be proficient as well.

It goes too far to transform this general requirement into one that is specific. Souderton does not bear the legal burden of ensuring that *every* student is proficient. It is only required to ensure that the proper proportion of its schools' populations are.

in August and September of 2005 by Ms. Elizabeth Patterson, a certified audiologist. (Audiology evaluation at 7–8 (J.H. Ex. 12).)  One of her conclusions was that the tests indicated "a central auditory processing deficit," which would affect his auditory working memory and short term auditory memory.  (Id. at 6.)  Her primary recommendation was that J.H. receive language therapy, which should incorporate various compensatory strategies for the working memory issues.  (Id. at 7.)

A later evaluation, however, points the other way.  A December 2005 evaluation found that "all [of J.H.'s] language-based scores were in the Average Range."  (Valentini Report at 3, Findings of Fact ¶ 5.)  J.H.'s low working memory deficit was noted.  (Id.) The evaluator determined that the deficit did not interfere with his overall language processing skills.  (Id.)  It was determined that [J.H.] did not present with a speech-language disability."[29]  (Id.)  The parties have not submitted additional evidence of any subsequent testing.

The parents support the results from the earlier testing, but I find that the validity of those results was undercut by the December 2005 evaluation.  I am mindful of the Third Circuit's guidance that "an IEP must take into account what was, and was not, objectively reasonable . . . at the time the IEP was drafted."  Fuhrmann v. East Hanover

---

[29] A more recent evaluation performed in 2007 by Dr. Nelson also indicated that J.H. did not demonstrate "a need [for speech and language services], but the evaluation's weight is limited:

Q.:      [Mr. Stanczak]: Now, Dr. Nelson did not conduct any specific
         assessment of speech and language abilities?
A.:      [Ms. Fogle]: Not that I am aware of.

(Test. of Ms. Fogle 134:1–4.)

Bd. of Educ., 993 F.2d 1031, 1041 (3d Cir. 1993).  When this IEP was drafted, Souderton

faced an unclear record.  Tests pointed in both directions, but the prior proceedings had

considered this evidence and agreed with Souderton's assessment that J.H. was not

eligible for speech/language services.  As a result, Souderton did not believe it had to

provide such services.  Based on this record, I find that Souderton was not aware of J.H.'s

speech/language disability at the time the IEP was drafted.[30]

### 2) The IEP does contain some speech/language services

Under the IEP, his special education teacher is to consult with a speech therapist

on a monthly basis "to discuss [his] progress, instruction, and specially designed

instruction."  (IEP at 55; Myers Report at 8.)  While this provision may not be of the same

caliber of the services J.H. had desired, it is sufficient to meet the needs J.H. was believed

have at that time.  Additionally, Souderton is not required to provide everything the

parents want.  It is required to provide only those services necessary to confer meaningful

educational benefit, not perfect educational benefit.

In reaching this conclusion, I am also persuaded by the decisions from the first

round of due process hearings.  While not controlling, such rulings can be informative.

Dr. Valentini and the prior Appeals Panel was presented with all of these testing results,

---

[30] Whether the differing evaluation results here should have raised questions and whether
Souderton should have conducted another evaluation are debatable points but need not be resolved here.
The touchstone of the district court's review of an IEP is whether the plan provides meaningful
educational benefits appropriately tailored for the child.  When this IEP was drafted, there was no clear
indication that J.H. needed or was eligible for speech/language services.  This is not a situation where
Souderton blindly ignored potential signs of need.  On the contrary, J.H.'s needs have been evaluated,
and no new evidence was presented to suggest that his needs have changed in the interim.

and both found that J.H. was ineligible for additional speech and language services.  (See Valentini Report at 11 ("The [2005–2006] IEP contained results of District evaluations as well as evaluations from a private speech/language evaluator [and] an IU speech/language evaluator . . . ."); 2007 Appeals Panel Report at 3 ("On June 22, 2005 . . . the Parents requested a speech/language evaluation which the District commissioned.  The report issued by the speech/language specialist stated that the Student did not present a speech/language disability . . . .").)  The IEP was found to be sufficient both times despite the absence of speech/language services.  These decisions understandably led Souderton to believe these services were not necessary, and as discussed above, there was no additional testing.  (See Myers Report at 8 ("There [was] no new evidence of changed speech and language needs.").)  In light of this factual record, Souderton reasonably relied on the prior decisions when drafting the IEP.

### 3) J.H.'s participation in speech therapy at Crossroads does not necessarily make him eligible

I am unpersuaded by J.H.'s argument to the extent his claim is based on the fact that he receives speech/language services at Crossroads.  J.H. receives both small group and whole group speech therapy.  (Test. of Ms. Cordivari 65:9–17.)  All Crossroads students participate in the whole group speech therapy.  (Id. 74:21–23 ("All students receive whole group speech and language therapy . . . .").)  Because Crossroads "work[s] with students with language based learning differences," the fact that J.H. participates in

whole group speech therapy is of minimal weight.[31]  (Id. 24:23–24.)

I find that J.H.'s enrollment in small group therapy does not prove a need for speech/language services.  He was placed in small group therapy on the basis of an admission screening and the December 2005 evaluation, which showed that J.H. had a low working memory score.  (Id. 47:6–14 (stating that J.H.'s speech/language therapy placement was determined from the information provided at the time of his admission and the results of his enrollment evaluation); id. 67:2–13 (stating that J.H. was placed in small group speech because he had a low working memory score).)  He worked on his receptive and expressive language skills.[32]  (Id. 67:10–13.)  The initial admission screening was not presented to the court.  Due to this absence in the record, I can only proceed on the evidence that is available: J.H.'s low working memory score.  It has already been determined that the score does not make him eligible for speech/language services.  (See Valentini Report, Findings of Fact ¶ 5 ("[J.H.'s] working memory deficit [does] not interfere with overall language processing as all his language-based scores were in the Average Range.").)

---

[31] J.H. has not argued that all Crossroads students would automatically qualify for speech/language services if placed in their local public schools.

[32] As Ms. Cordivari explained,

> For [J.H.] the therapy goals are in the language area, primarily receptive language. . . . [T]he receptive language goals are . . . auditory memory, comprehension skills, following multi-step directions, understanding of word relationships.  He also had three expressive language goals: Formulating ideas, to choosing precise words, and organizing thoughts verbally.  That was one goal.  Expressing word relationships and vocabulary improvement.

(Test. of Ms. Cordivari 46:14–25.)

I find that the Appeals Panel did not properly consider all of this evidence and provided no reasoning for its decision to overturn Mr. Myers' conclusion on this point. Based on the record available at the time of drafting, I find that J.H. was not eligible for speech/language services, and I will reverse the Appeals Panel ruling on this point.

### 4) The link between speech/language and writing needs is tenuous

J.H. presents an alternative argument tying his speech/language needs to his writing needs. He contends that "there is a clear relationship between his need for language therapy and his writing ability." (Defs.' Mem. at 18.) Because the oral language precedes the written language, mastery of oral language skills would greatly facilitate the acquisition of higher academic skills. (Id.) Consequently, the speech/language services should be an integral part of J.H.'s overall writing expression instruction.

I do not find this argument persuasive. I agree that the testimony and evidence presented to Mr. Myers does indicate a link between oral and written language skills.[33]

---

[33] As Ms. Cordivari testified:

    Q.:    [Mr. Stanczak] Is there, if you know, is there a relationship between the speech and language therapy and [J.H.'s] writing instruction?

    A.:    [Ms. Coridvari] Certainly, because the oral language precedes the written language and the oral language base is very important for developing the written language skills.

(Test. of Ms. Cordivari 47:15–21.)

Ms. Italiano's testimony is not contradictory:

    Q.:    [Mr. Romberger] Let me ask if you have any understanding of how, if at all, speech and language relates to a student's development of writing skills?

    A.:    [Ms. Italiano] Well, I would not say that there is no correlation whatever between someone's ability to speak and use language and their ability to write . . .

The disagreement is how linked these two sets of skills are, and I find that J.H. has not

sufficiently proven that his writing expression needs must be addressed through

speech/language services.[34]

### D) OT services

I find that the absence of OT services in the proposed IEP is not fatal.  Even

though a formal OT evaluation was not performed until the summer of 2007, J.H.

contends that Souderton was long aware of his possible need for OT services.  J.H. has

had "long-standing difficulty with legibility as well as with written expression," a fact

which Souderton would have been aware.  (Defs.' Mem. at 9.)  Despite knowing of J.H.'s

great difficulties with writing, Souderton did not evaluate him fully and failed to provide

the necessary services.

J.H.'s decision to reject the revised IEP as untimely ignores the fact that J.H. did

not provide the OT evaluation results until well after the school year had begun.

---

(Test. of Ms. Italiano 229:19–25.)

[34] My ruling takes into account, and is not controverted by, Ms. Cordivari's testimony:

> Q.:    [Mr. Stanczak] [D]o you have an opinion as to whether or not [J.H.] could
>        be expected, reasonably expected to make meaningful progress in writing
>        if he did not receive the speech and language therapy?
>
> A.:    [Ms. Cordivari] The writing would be slower.
>
> Q.:    And, again, I am not asking you to provide a scientific calculation but do
>        you believe it will be significantly slower without the speech and language
>        therapy?
>
> A.:    Yes.  I mean, I can't quantify what significantly means, but there would be
>        an impact.

(Test. of Ms. Cordivari 48:5–17.)  The presence of a potential impact does not convert the
speech/language services into a necessary provision for a FAPE.  J.H.'s writing progress may be slower
without such services, but that does not mean he would fail to receive meaningful educational benefits in
the area of written expression under the IEP.

Souderton was first informed at the August 28, 2007 IEP team meeting that an OT evaluation had been performed.  (See Test. of Ms. Fogle 95:9–13.)  After appropriate changes reflecting the meeting's discussions were made, the IEP was sent to the parents the next day.  (Id. 99:17–22.)  This draft did not include any OT provisions.

Souderton was provided the OT evaluation results on October 14, 2007, which was long after the IEP was formulated.  After receiving the report, Souderton revised the IEP by inserting a clause providing for J.H. to be re-evaluated for potential OT needs within thirty days of his return to its schools.  (Revised IEP at 23 (Souderton Ex. 15); Test. of Ms. Fogle 138:19–25.)  J.H.'s contention that the IEP should be rejected as late is nonsensical: the OT evaluation results were submitted far too late to be included in the original IEP.

Whether J.H.'s handwriting issues were of such a nature that Souderton can be presumed to have been aware of a potential need for OT is not sufficiently supported. First, J.H. asserts that the Caregiver Questionnaire submitted to Souderton indicated that he had been receiving OT services at Crossroads.  (Caregiver Questionnaire at 17 (J.H. Ex. 2).)  This assertion is directly contradicted by Ms. Cordivari's statement that Crossroads does not offer OT services.  (See Test. of Ms. Cordivari 27:22–23 (stating that Crossroads does not provide OT services).)  Second, whether Souderton should have provided OT is debatable.  J.H.'s mother, Ms. S.H., testified that his handwriting was an issue previously raised with Souderton.  (Test. of Ms. S.H. 151:20–25.)  Souderton

performed an assessment and determined that J.H. was not eligible for OT services.  (Id.)

Ms. Carroll's report clearly points in the other direction, but was not reported to

Souderton until after the IEP was submitted to J.H.'s parents.  To say that Souderton

ignored J.H.'s possible OT needs, however, fails to recognize that *at the time the IEP was

drafted*, Souderton was operating from the reasonable baseline of that prior evaluation.

Bearing this standard in mind, I do not find that Souderton ignored J.H.'s potential OT

needs when drafting the first IEP.[35]

**E) Tuition reimbursement**

Because I find that Souderton did provide J.H. a FAPE through its IEP, I need not

analyze whether Crossroads is an appropriate placement.  Accordingly, J.H. is not entitled

to tuition reimbursement.

**IV. Conclusion**

For the foregoing reasons, Souderton's motion is granted, and J.H.'s motion is

denied.

---

[35] Even assuming *arguendo* that J.H. has valid OT needs, I find that the Appeals Panel failed to apply the proper standard of review.  The proper time frame for determining whether an IEP is "reasonably calculated to enable the child to receive educational benefits," Bd. of Educ. v. Rowley, 458 U.S. 176, 206–07 (1982), is at the time it is offered to the student.  See Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).  Souderton reasonably based some of the 2007–2008 IEP on the prior proceedings' rulings, which had  implicitly accepted the 2006–2007 plan's silence on OT.  Moreover, Souderton was not informed of the results of the private evaluation until *after* the school year began.  It should not be faulted for having produced a "late" IEP.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE SOUDERTON AREA | : | |
| SCHOOL DISTRICT, | : | CIVIL ACTION |
|      Plaintiff | : | |
| | : | |
|   v. | : | NO. 08-2477 |
| | : | |
| J.H., by and through his parents, J.H. | : | |
| and S.H., and J.H. and S.H. | : | |
| in their own right, | : | |
|      Defendants | : | |

**O R D E R**

**STENGEL, J.**

     **AND NOW**, this 11th day of February, 2009, upon careful consideration of the plaintiff's Motion for Judgment on the Administrative Record (Document #11) and the defendants' Motion for Summary Judgment or for Judgment on the Administrative Record (Document #12), the court finds that through the individualized education program provided to J.H., the Souderton Area School District provided J.H. with a free appropriate public education.

     **ACCORDINGLY**, the plaintiff's motion is GRANTED, and the defendant's motion is DENIED.

     The Clerk of the Court shall mark this case CLOSED for all purposes.

                         BY THE COURT:

                         /s/ Lawrence F. Stengel
                         LAWRENCE F. STENGEL, J.